# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| RE: ESTATE OF LUIS MICHAEL SANTAMARIA FERRUFINO | |
| *Plaintiff,* | |
| v. | **Case No.:** _____ |
| | **[JURY DEMAND]** |
| LOUDOUN COUNTY, VIRGINIA<br>Serve: Tim Hemstreet, County Administrator<br>Loudoun County Government Center<br>1 Harrison Street SE, 5th Floor<br>Leesburg, VA 20175<br><br>-and-<br><br>LOUDOUN COUNTY SHERIFF<br>Serve: Sheriff Michael L. Chapman, in his official capacity as Sheriff of Loudoun County, VA<br>Loudoun County Sheriff's Office<br>803 Sycolin Road SE<br>Leesburg, VA 20175<br><br>-and-<br><br>LOUDOUN COUNTY ADULT DETENTION CENTER<br>Serve: Loudoun County Sheriff's Office<br>42035 Loudoun Center Place,<br>Leesburg, VA 20175<br><br><br>*Defendants.* | |

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, the Estate of Luis Michael Santamaria Ferrufino, ("Mr. Ferrufino"), by his administrators of estate, Monica Patricia Ferrufino Antezana and Monica K. Santamaria Ferrufino ("Plaintiff"), by counsel, and files its Complaint, stating the following in support thereof:

1. This is a wrongful death action brought by the Estate of Luis Michael Santamaria Ferrufino against Loudoun County, Virginia, for violations of the United States Constitution, pursuant to 42 U.S.C. § 1983 for deliberate indifference to serious medical needs and failure to protect from known suicide risk, including municipal liability under *Monell*, and parallel state-law claims for wrongful death, gross negligence, and survivorship.

2. As a direct and proximate result of Defendant's acts and omissions, Mr. Ferrufino suffered preventable death while in custody of the Loudoun County Adult Detention Center ("ADC").

3. Within days of being booked into the ADC on August 30, 2024, Mr. Ferrufino, an individual with a documented history of severe mental illness, substance abuse disorder, and past inpatient psychiatric and rehabilitation admissions, died by suicide in his cell on September 6, 2024. At the time of his death, ADC and its contracted medical providers had actual knowledge of his mental health history, active withdrawal, and escalating behavioral symptoms.

4. Despite written policies governing suicide prevention and response (Loudoun County Sheriff's Office General Order ("LCSO GO") 503.4 – Attempted Suicide), death response (LCSO GO 503.5 – Death of an Inmate), Incident Reporting (LCSO GO 502.9 – Housing Unit and Inmate Cell Entry), together with statewide minimum standards for receiving screening and continuity of care (6VAC15-40-420), the ADC personnel failed to implement required measures. These systemic deficiencies, including failures in training, supervising, policy adherence, and continuity of care, proximately caused Mr. Ferrufino's death.

5.  Medical care policies designed to protect detainees in exactly these circumstances, ADC personnel failed to provide constitutionally adequate medical and mental health care, did not monitor him according to established policies, and disregarded their own protocols for withdrawal management, suicide risk assessment, and crisis intervention. The County's systemic deficiencies, including failures in training, supervision, and policy enforcement proximately caused Mr. Ferrufino's death.

6.  Plaintiff seeks compensatory damages and attorney's fees.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1367, as Plaintiff asserts federal constitutional claims under 42 U.S.C. § 1983 and related state law claims. Venue is proper under 28 U.S.C. § 1391(b) because all events occurred in Loudoun County, Virginia.

## PARTIES

8.  Plaintiff, Monica Patricia Ferrufino Antezana is one of the two duly appointed Administrators of the Estate of Luis Santamaria Ferrufino, and mother of the deceased, and a resident of Virginia.

9.  Plaintiff, Monica K. Santamaria Ferrufino is the other one of two duly appointed Administrators of the Estate of Luis Santamaria Ferrufino, and sister of the deceased, and a resident of Virginia.

10. Defendant Loudoun County, Virginia ("County") is a political subdivision of the Commonwealth of Virginia, organized and existing under the laws of the Commonwealth. Loudoun County is responsible for establishing and maintaining policies, customs, and practices governing the Loudoun County Adult Detention Center ("ADC") and its personnel.

11. Defendant Sheriff Michael L. Chapman, ("Sheriff") is the elected Sheriff of Loudoun County, Virginia, and at all relevant times was acting under color of state law. The Sheriff is

responsible for the operation of the Loudoun County Sheriff's Office and the ADC, as well as the training, supervision, and discipline of deputies and correctional officers. Sheriff Chapman is sued in his official capacity.

12. Defendant Loudoun County Sheriff's Office correctional officers and deputies were at all relevant times employed by the Sheriff's Office and acting within the scope of their employment under color of state law. These individuals were directly involved in the intake, housing, monitoring, and supervision of Mr. Ferrufino during his confinement at ADC. They are sued in both their individual and official capacities. Their true names and identities are presently unknown to Plaintiff but will be substituted by amendment when ascertained.

## FACTUAL BACKGROUND

### Known Medical & Mental Health History and Risks

13. Mr. Ferrufino had a long and well-documented history of severe substance abuse disorder, including opioids, stimulants, and alcohol dependence, with prior inpatient and outpatient rehabilitation facilities for detoxification and treatment, multiple prescription medications, and associated mental health symptoms.

14. Records show prescriptions for buprenorphine/naloxone (Suboxone), quetiapine (Seroquel), trazodone, venlafaxine, gabapentin, and amphetamine-dextroamphetamine. *See* **Exhibit 1,** attached hereto and made a part hereof.

15. On January 15, 2018, his medical records documented depressed mood, hopelessness, and suicidal thoughts in the context of sobriety maintenance challenges. *See* **Exhibit 2,** attached hereto and made a part hereof

16. Treatment notes from March 6, 2018, documented "Patient presents with severe alcohol abuse and ongoing opioid dependence, recent relapse, and significant withdrawal symptoms; high risk for suicidal ideation during withdrawal phase" *See* **Exhibit 2.**

4

17. Further, another clinical program notes reflects Mr. Ferrufino had recently left inpatient rehab and is struggling with cravings; acknowledges past suicide attempt; ongoing risk if unmonitored in withdrawal.

18. A sponsor letter reflects Mr. Ferrufino's expressed fear of "going to jail because of his detox" and that he "couldn't go through it again." Consistent with heightened suicide risk during unmedicated withdrawal. *See* **Exhibit 2.**

19. Prior ADC confinements included detoxification under observation and protective measures, consistent with known risks during withdrawal.

20. In February 2021, during a Court mandated Loudoun County Community Corrections evaluation, Mr. Ferrufino reported insomnia and depression and listed active prescriptions as follows: Suboxone, Seroquel, Trazodone, Venlafaxine, and Gabapentin. He also disclosed substance use involving alcohol, prescription medications, and marijuana, with prior treatment at the Palm Beach Institute from 2019 and Kaiser Permanente IOP. *See* **Exhibit 2.**

21. This documented history was available to the Loudoun County Sheriff's Office and ADC staff through medical release, arrest history, and past ADC intake data.

22. Before his August 2024 arrest, Mr. Ferrufino had a long history of severe substance use disorder, including opioid dependence, stimulant misuse, and alcohol abuse.

23. His condition was well known to Loudoun County law enforcement due to multiple prior arrests, court appearances, and mandated treatment orders. *See* **Exhibit 3,** attached hereto and made a part hereof.

24. Mr. Ferrufino had been admitted to multiple rehabilitation facilities in Virginia and elsewhere, where he was treated for both substance abuse disorder and co-occurring psychiatric conditions. *See* **Exhibit 2 and 3.**

25. These inpatient records, accessible to ADC medical staff through standard records requests, documented withdrawal complications, suicidal ideation during detoxification, and the necessity of carefully managed medication-assisted treatment ("MAT") to prevent relapse or self-harm.

26. The Loudoun County Sheriff's Office and ADC maintained access to past arrest and incarceration files showing that Mr. Ferrufino had experienced withdrawal during earlier confinements and that jail medical personnel had previously flagged him for "mental health watch" status.

27. These official records confirm longstanding mental-health and substance use treatment needs known to Loudoun authorities.

***Arrest and Intake Failures***

28. On August 29, 2024, Mr. Ferrufino was arrested for a non-violent offense and transported to the Loudoun County ADC as a pretrial detainee.

29. At intake, ADC was required to conduct screening, obtain and verify medical history and prescriptions, including psychiatric medications and to assess suicide risk. *See* 6VAC15-40-450-1010; ADC Inmate Handbook, Mar. 2023.

30. Intake documentation from August 29, 2024, reflects that Mr. Ferrufino expressly requested continuation of his prescribed medications, noting urgency and risk of seizure if medications were not provided. *See* **Exhibit 4,** attached hereto and made a part hereof.

31. Mr. Ferrufino reported a long-term medication-assisted treatment ("MAT") with buprenorphine/naloxone (Suboxone) for the last five years, and psychiatric prescriptions including 40 mg daily of Adderall (amphetamine-dextroamphetamine), Gabapentin 800 mg three times daily, Seroquel (quetiapine) 200 mg nightly, and Trazodone 100 mg nightly. *See* **Exhibit 5,** attached hereto and made a part hereof.

32. These prescriptions were consistent with his February 2021 Loudoun Community Corrections evaluation and primary physician medical records, which listed Suboxone, Seroquel, Trazodone, Venlafaxine, and Gabapentin. *See* **Exhibit 1, and Exhibit 3.**

33. This confirmed continuity of treatment needs and put ADC on notice of the urgency of his serious medical and psychiatric vulnerabilities. Mr. Ferrufino specifically requested that his records be retrieved, and his prescriptions continued. *See* **Exhibit 4 and 5.**

34. Despite these disclosures, ADC medical records reflect that his prescriptions were cancelled as "cancelled by provider" without verification, and no effort was made to secure continuity of care as required by 6VAC15-40-120 and ADC policy. This failure left him unmedicated and in withdrawal, substantially heightening suicide risk. *See* **Exhibit 5.**

35. ADC instead provided only over the counter and symptomatic withdrawal medications, including ibuprofen for pain, hydroxyzine for anxiety/insomnia, and clonidine for withdrawal, but withheld his long-term psychiatric and MAT regimen. *See* **Exhibit 5.**

36. The discontinuation, without substitution or taper, left Mr. Ferrufino unmedicated during acute withdrawal and heightened suicide risk.

37. On August 30, 2024, ADC medical staff ordered that Clinical Opiate Withdrawal Scale ("COWS") and Clinical Institute Withdrawal Assessment for Alcohol ("CIWA-AR") assessments be conducted on Mr. Ferrufino every eight hours for five days. *See* **Exhibit 5.**

38. Between August 30 and September 3, 2024, these assessments recorded repeated symptoms of withdrawal, and physical distress, including vomiting, diarrhea, chills, gooseflesh, and muscle aches. *See* **Exhibit 5.**

39. Monitoring notes documented persistent withdrawal symptoms, anxiety, and severe insomnia, all of which are well-established risk factors for suicide in the withdrawal phase. *See* **Exhibit 5.**

40. Mr. Ferrufino disclosed prior suicide attempts and current withdrawal symptoms, but ADC staff did not activate suicide watch or detoxification protocols required.

41. Under LCSO GO 503.4 (Attempted suicide), deputies were required to: (1) place at-risk inmates on protective custody status with constant observation; (b) conduct 15-minute checks; (c) perform medical checks twice per hour; and (d) notify on-site mental health staff or Loudoun County Mental Health Emergency Services. Placement in general population required clearance by both medical and mental health staff with supervisor approval.

42. Despite his disclosure of a recent inpatient treatment, withdrawal symptoms, prior suicidal thoughts, and insomnia, which are multiple risk indicators, Mr. Ferrufino was not classified as a high-risk inmate, was not referred for immediate medical clearance, and subsequently housed in general population.

43. Intake medical records further reflect that ADC staff formally acknowledged Mr. Ferrufino's substance and alcohol abuse history and identified him as at risk for withdrawal. Provider orders documented his longstanding dependence and active withdrawal concerns. *See* **Exhibit 6,** attached hereto and made a part hereof.

44. Even with this acknowledgment, ADC personnel failed to initiate required suicide-prevention and withdrawal protocols. Mr. Ferrufino was not placed on protective custody, not subjected to 15-minute or constant observation, and not referred for immediate mental-health evaluation as required by LCSO GO 503.4 and 6VAC15-40-1010. Nor did ADC staff verify or continue his prescribed medications, in violation of 6VAC15-40-420.

45. On August 30, 2024, ADC submitted a request for his outside medical records. However, the records reflect that they were not received until September 10, 2024, four days after his death. *See* **Exhibit 7,** attached hereto and made a part hereof.

46. There is no documentation of any follow-up or expedited effort to obtain the records before his suicide on September 6, 2024. This gap deprived him of the continuity of care required under which was critical to his survival.

47. The records produced to date contain no documentation that protective custody or constant observation was initiated in his case.

48. Mr. Ferrufino entered custody in acute withdrawal, reporting he was not sleeping and was in both physical and emotional distress. These conditions are recognized in medical literature and ADC's own suicide prevention policy as multipliers of suicide risk.

49. Multiple medical treatment records documented that Mr. Ferrufino suffered from suicidal ideation during withdrawal, and his 2021 Community Corrections evaluation confirmed insomnia, depression, and reliance on psychiatric medications. Thus, Loudoun County officials already had notice of his vulnerabilities long before August 2024. *See* **Exhibit 2.**

*Medical Requests and Escalation Failures*

50. On or about September 3, 2024, ADC deputies reported that Mr. Ferrufino had banged on his cell door all night, swore at staff, and was "too uncooperative" to complete withdrawal assessments, and also "refused." These behaviors were hallmark signs of mental health crisis. *See* **Exhibit 5.**

51. On or about September 3, 2024, Mr. Ferrufino submitted a handwritten medical request slip stating he was in "a lot of pain physically and emotionally," that he had "not slept in 5 days," and requested that ADC obtain his Kaiser Permanente records to resume his prescribed medications. *See* **Exhibit 5, and Exhibit 8,** attached hereto and made a part hereof.

52. Instead of viewing these behaviors as signs of deteriorating mental and physical condition, ADC staff treated them as disciplinary matters, effectively punishing Mr. Ferrufino by withholding further assessment instead of providing care.

53. Mr. Ferrufino's handwritten medical request on September 3 was his clearest cry for help, stating explicitly that he was in severe pain, could not sleep, and needed his prescriptions restarted. *See* **Exhibit 8.**

54. The request was logged and triaged at a routine level despite clear indications of medical and psychiatric crisis. Severe insomnia, withdrawal, and emotional distress are all red-flag indicators under LCSO GO 503.4 (Attempted Suicide), which requires immediate escalation and protective custody status when suicide risk is present.

55. Additionally, 6VAC15-40-450-1010 mandates that every local correctional facility maintains a written suicide prevention and intervention plan covering intake, screening, intervention, referral, and training of staff. ADC's inaction violated both its internal policy and state regulations.

56. On September 4, 2024, Mr. Ferrufino was seen twice by ADC medical staff. At 7:36 a.m., at his medical appointment he once again requested that staff follow up with his outside medical providers, Kaiser Permanente and Bicycle Health, regarding his addiction treatment and prescriptions, again underscoring the need for continuity of care. *See* **Exhibit 5.**

57. Later that day, at 3:40 p.m., he was seen for physician ordered mental health appointment, confirming ADC's recognition of his psychiatric needs and withdrawal complaints. *See* **Exhibit 5.**

58. Yet no record reflects that ADC verified his prescriptions with outside providers, reinstated his long-term medications, or initiated protective custody and suicide watch. His mental health appointment was treated as routine, and staff took no additional steps required by LCSO GO 503.4

or Virginia's 6VAC15-40-1010, both of which mandate protective housing and observation when suicide risk is present.

59. Records reflect that COWS/CIWA withdrawal monitoring continued over multiple days, consistently documenting persistent withdrawal symptoms including anxiety, physical discomfort, and insomnia. *See* **Exhibit 5.**

60. Despite these ongoing entries, ADC staff did not escalate to protective housing or initiate psychiatric evaluation.

61. Mr. Ferrufino was never placed on suicide watch or moved to enhanced monitoring housing.

62. This contravened LCSO GO 503.4, which requires mental health counselor involvement whenever suicide risk factors are identified. It also violated 6VAC15-40-450, which mandates that facilities ensure continuity of care and prompt medical follow-up for detainees presenting with significant health needs at intake.

63. No record shows that medical staff followed up with Kaiser Permanente, Palm Beach Institute, other medical providers, or his pharmacies to verify prescriptions prior to his death.

64. The only documented request for outside records occurred on August 30, 2024, but the records were not received until September 10, 2024, four days after his death, and there is no evidence of any follow-up or urgent request to expedite retrieval in the intervening week. *See* **Exhibit 7.**

65. This failure violated 6VAC15-40-420, requiring verification of health information from outside providers and continuation of essential medications, to ensure uninterrupted care for detainees with existing treatment needs.

66. The delay in receiving these records meant that ADC staff never confirmed his history of Suboxone, Seroquel, Trazodone, Venlafaxine, and Gabapentin, or his diagnosis of insomnia and depression.

67. Without verification, ADC staff failed to provide the medications or mental-health evaluation necessary to stabilize him during withdrawal, depriving him of continuity of care.

68. Instead, Mr. Ferrufino was only given ibuprofen, hydroxyzine, and clonidine. The denial of his prescribed regimen during acute withdrawal magnified his suicide risk. *See* **Exhibit 5.**

69. Despite his repeated written and clinical red flags, no protective custody, no 15-minute checks, and no mental-health counselor involvement are reflected in the records.

70. LCSO GO 503.4 requires constant observation, 15-minute checks, medical checks twice hourly, and mental-health counselor involvement whenever suicide risk factors are identified. Records produced to date reflect none of these protective steps were taken in Mr. Ferrufino's case, despite his written request and obvious clinical deterioration.

71. This omission also violated 6VAC15-40-450, which mandates that each facility maintain and implement procedures for suicide prevention and intervention, including timely referral to qualified mental health personnel.

72. Based on the records produced to date, ADC staff had actual knowledge of his deteriorating physical and mental condition but failed to act on it. Mr. Ferrufino's September 3 medical request put them on explicit notice of his pain, lack of sleep, and psychiatric needs. *See* **Exhibit 8.**

73. The continued absence of escalation over the following days constitutes deliberate disregard of a known, serious risk.

***Death and ADC Response***

74. On September 6, 2024, ADC staff found Mr. Ferrufino unresponsive in his single-occupancy cell with a ligature made from his bed sheet tied around his neck. *See* **Exhibit 9,** attached hereto and made a part hereof.

75. ADC staff initiated CPR prior to EMS arrival and administered three 4 mg doses of intranasal naloxone without effect. An AED was applied and delivered "no shock advised" on three separate analyses.

76. EMS was then dispatched at 10:09:47 a.m. to Loudoun County ADC for cardiac arrest/asphyxia. *See* **Exhibit 9.**

77. EMS arrived on scene at 10:17:54 AM. On arrival, correctional officers were performing high-performance CPR. Mr. Ferrufino was unresponsive, pulseless, and asystolic. *See* **Exhibit 9.**

78. Cardiac monitoring consistently showed asystole. No return of spontaneous circulation (ROSC) was achieved. After approximately 25 minutes of advanced resuscitative efforts, including ultrasound demonstrating no cardiac activity, EMS consulted online medical control. A termination of resuscitation order was given at 10:50 AM, and Mr. Ferrufino was pronounced deceased at the scene. *See* **Exhibit 9.**

79. The EMS report lists the cause of injury as "Asphyxiation – Hanging" and primary impression as cardiac arrest secondary to suicide attempt. *See* **Exhibit 9.**

80. The Medical Examiner subsequently confirmed the cause of death as hanging and the manner of death as suicide. *See* **Exhibit 10,** attached hereto and made a part hereof.

81. The Medical Examiner's autopsy report documents a ligature furrow of the anterior right neck, abrasions of the left check, chest, abdomen, upper extremity and knee. Internal examination revealed focal hemorrhage of the left sternohyoid and omohyoid muscles, acute pulmonary edema,

and rib fractures consistent with resuscitation efforts, with minor blunt force injuries. *See* **Exhibit 10.**

82. The toxicology analysis revealed norbuprenorphine (0.00078 mg/L), buprenorphine (<0.00050 mg/L), naloxone (>0.020 mg/L), and nordiazepam (0.045 mg/L). No ethanol or other controlled substances were detected. This profile was consistent with prior Suboxone treatment and did not reflect acute intoxication. *See* **Exhibit 10.**

83. Despite his well-documented medical history, psychiatric prescriptions, and repeated pleas for help, Mr. Ferrufino received no continuity of his long-term medications while in custody.

84. His Suboxone, Seroquel, Trazodone, Venlafaxine, and Gabapentin were discontinued as "cancelled by provider" at intake without verification, replaced only with symptomatic treatments like ibuprofen, hydroxyzine, and clonidine. *See* **Exhibit 5.**

85. As noted, ADC requested outside medical records on August 30, 2024. These were not received until September 10, 2024, four days after death. *See* **Exhibit 7.**

86. There is no evidence in the records currently available that ADC staff followed up or sought expedited retrieval.

87. While emergency measures were taken once Mr. Ferrufino was discovered hanging, the facility had failed to comply with its own suicide-prevention and continuity-of-care obligations in the days leading up to his death.

88. At the time of his confinement, ADC staff had actual knowledge of multiple suicide risk factors, including acute untreated withdrawal, severe insomnia, psychiatric history, and prior suicidal ideation, and his explicit written request for help just three days earlier. *See* **Exhibit 8.**

89. Despite these indicators, ADC housed Mr. Ferrufino in a general-population cell with full bedding and accessible ligature points, rather than placing him in protective custody or suicide-resistant housing.

90. This placement violated LCSO GO 503.4, which requires protective custody, removal of potential ligatures, frequent observation, and mental-health evaluation for detainees at risk of suicide.

91. The practice also contravened nationally recognized standards. The American Correctional Association Standards for Adult Local Detention Facilities, § 4-ALDF-4C-22, and the National Commission on Correctional Health Care Standards, § J-G-05, both require removal of bedding and placement in ligature-resistant housing when suicide risk is identified.

92. Federal courts consistently treat leaving bedsheets with suicidal detainees as deliberate indifference. In *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 480 (6th Cir. 2020), the Sixth Circuit reversed summary judgment where an officer placed a known suicidal detainee in a cell with a bedsheet. In *Beckwith v. Blair Cnty.*, Civ. No. 3:18-40, 2022 WL 225456 (W.D. Pa. Jan. 28, 2022), summary judgment was denied where a detainee on suicide watch used strips of a bedsheet to hang herself.

93. By leaving Mr. Ferrufino in general population with a bedsheet, ADC staff ignored their own policy, disregarded professional correctional standards, and provided him with the very means of suicide. This failure independently demonstrates deliberate indifference and materially contributed to his death.

94. LCSO GO 503.4 requires protective custody, constant observation, 15-minute checks, and psychiatric referral. 6VAC15-40-420 required verification and continuation of his prescriptions. 6VAC15-40-450/1010 required implementation of a suicide prevention program.

95. These policies were completely disregarded by County employees and agents.

96. Loudoun County had actual knowledge of the risks posed by failing to provide prescribed medications, monitor detainees with psychiatric histories, and place at-risk detainees on suicide watch. This knowledge came from established correctional standards and Virginia regulations.

97. Defendant's systemic policy and training failures let this incident occur, including:

    a.  Failing to ensure verification and continuation of necessary medications.

    b.  Failing to respond to withdrawal symptoms and mental health crisis behaviors.

    c.  Failing to implement suicide prevention protocols despite obvious risk factors.

    d.  Failing to train officers and ADC staff to recognize and appropriately respond to suicide risk.

    e.  Maintaining customs and practices of downplaying or ignoring detainee medical requests.

98. As a direct result of Defendant's acts and omissions, Mr. Ferrufino's death by suicide was unnecessary and preventable, and occurred within days of entering ADC custody.

99. The County's systemic failure to coordinate between medical and security staff ensured that each warning sign was viewed in isolation, preventing the assembly of a complete risk picture for Mr. Ferrufino.

100.    Taken together, these failures reflect not an isolated oversight, but a pattern of noncompliance with written suicide prevention mandates, continuity-of-care requirements, and death-response obligations. Had ADC personnel adhered to their own policies and the regulations of Virginia, Mr. Ferrufino's death by hanging would have been preventable.

101.     The County's training records, obtainable through discovery, will show a lack of recent suicide prevention training for many deputies assigned to ADC, violating Virginia Department of Corrections operational standards.

102.     By disregarding these protocols, Loudoun County showed deliberate indifference to Mr. Ferrufino's medical and psychiatric needs under the Eighth and Fourteenth Amendments.

103.     These acts and omissions are also gross negligence under Virginia law, as they reflect utter disregard for inmate safety, particularly for detainees with known vulnerabilities.

104.     At all times, the medical staff involved, the deputies on duty, acted as agents of Loudoun County within the scope of their employment, binding the County to their acts and omissions.

105.     Loudoun County's refusal to produce investigative records, medical logs, and surveillance footage in response to the Plaintiff's FOIA request further shows a pattern of concealing policy failures rather than correcting them.

106.     Mr. Ferrufino's death was the foreseeable and preventable result of the County's decision to ignore its own medical and suicide prevention policies, fail to act on clear warning signs, and maintain systemic deficiencies in training, staffing, and oversight. *See* **Exhibit 11,** attached hereto and made a part hereof.

107.     On January 15, 2025, the Estate, through counsel, served a written Notice of Intent to Sue pursuant to Virginia Code § 15.2-209 on Loudoun County Attorney Leo Rogers, Sheriff Michael Chapman, and Major Calvin Moore, Corrections Division Commander of the Loudoun County Adult Detention Center. *See* **Exhibit 12,** attached hereto and made a part hereof.

108.     The notice preserved the Estate's right to pursue a wrongful death claim under Virginia law and satisfied the statutory prerequisites for suit against Loudoun County and its officers.

## CLAIMS FOR RELIEF

### Count I – 42 U.S.C. § 1983
### (Deliberate Indifference to Serious Medical Needs—against all Defendants))

109.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

110.     Pretrial detainees have a constitutional right to adequate medical and mental health care Fourteenth Amendment.

111.     To establish deliberate indifference under 42 U.S.C. § 1983, Plaintiff must show: (1) a serious medical need, (2) actual knowledge of the risk by jail officials, and (3) deliberate disregard of that risk caused injury or death. *See Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994).

112.     At all relevant times, Mr. Ferrufino suffered serious medical and mental health conditions, including major depressive disorder, poly-substance abuse disorder, and acute withdrawal symptoms.

113.     These conditions required ongoing medication (Suboxone, Seroquel, Trazodone, Venlafaxine, Gabapentin, Adderall).

114.     ADC's own intake sheets from the night of his booking documented that Mr. Ferrufino urgently requested continuation of his medications, stating that he needed them immediately to avoid seizures. This disclosure made plain the urgency and necessity of maintaining his prescribed regimen.

115.     These needs were objectively serious, untreated withdrawal carries substantial risk of death and is recognized as a medical emergency. Virginia's jail standards specifically require

continuity of care for medications and treatment. *See* 6VAC15-40-420. The ADC Handbook promises "verification and continuation" of outside prescriptions.

116.     ADC intake medical records acknowledged his history of substance and alcohol abuse and identified him as at risk for withdrawal. Provider orders confirmed active withdrawal concerns and his dependence on prescribed medications. *See* **Exhibit 6.**

117.     These notes confirmed active withdrawal concerns and reflected staff awareness of his dependence on prescribed medications.

118.     On September 4, 2024, at his physical appointment he submitted a request at 7:36 a.m. for staff to follow up with his outside treatment providers, Kaiser Permanente and Bicycle Health, regarding his addiction treatment and prescriptions, and later the same day, at 15:40 was seen for a mental health appointment with a physician. These encounters reaffirmed his urgent medical and psychiatric needs and placed ADC on direct notice of the necessity of continuity of care. *See* **Exhibit 5.**

119.     Nevertheless, ADC cancelled his prescriptions as "cancelled by provider" without verification with outside treatment providers, in violation of 6VAC15-40-420, and substituted only ibuprofen, hydroxyzine, and clonidine. *See* **Exhibit 5.**

120.     ADC failed to implement required withdrawal and suicide-prevention protocols, including protective custody, 15-minute observation checks, and immediate mental-health referral as required by LCSO GO 503.4 and 6VAC15-40-1010.

121.     ADC staff had actual knowledge of these risks through intake disclosures on August 29, 2024, medical record requests, observation of visible withdrawal symptoms, and Mr. Ferrufino's own written request of September 3, 2024, stating, "I am in a lot of pain physically and emotionally," and "I have not slept in five days." *See* **Exhibit 8.**

122.    These records put the ADC on notice of a high-risk, untreated withdrawal and psychiatric crisis, and Defendants ignored it anyways.

123.    Defendants had actual knowledge of these conditions, Loudoun County, through its policymakers, supervisors, and agents, failed to provide necessary medical and mental health care, including:

  a.  Cancellation all psychiatric and MAT prescriptions at intake as "cancelled by provider" without verification, which is in contravention to 6VAC15-40-420, and LCSO GO 501.2's mandate to follow minimum standards;
  b.  Providing only ibuprofen, hydroxyzine, and clonidine, symptomatic treatment, not adequate care;
  c.  Failure to follow Withdrawal Protocol escalation requirements when symptoms persisted;
  d.  Not placing him on protective custody or initiate 15-minute checks as mandated by LCSO GO 503.4; and
  e.  Not escalating his September 3rd crisis request, instead triaging as "routine."

124.    This is not mere negligence, the ADC staff consciously disregarded clear warning signs. They had the means to act by suicide watch cells, policies, ability to verify medications, but chose not to. That meets deliberate indifference.

125.    By disregarding their own records and protocols, Defendants acted with deliberate indifference to Mr. Ferrufino's serious medical needs in violation of the Fourteenth Amendment.

126.    As a direct result of this disregard, Mr. Ferrufino deteriorated without treatment. On September 6, 2024, he was found hanging in his cell. The EMS records confirm prolonged resuscitation efforts without return of circulation. The Medical Examiner certified cause of death as "hanging; manner: suicide." *See* **Exhibit 10.**

127.    Had Defendants continued his medications, escalated his SCIWA/COWS findings, or initiated protective suicide measures, Mr. Ferrufino's death would not have happened. The deliberate indifference caused constitutional injury.

128.    These omissions were the direct and foreseeable cause of Mr. Ferrufino's death and constituted deliberate indifference in violation of the Fourteenth Amendment. As such, the ADC violated Mr. Ferrufino's Fourteenth Amendment Rights.

WHEREFORE Plaintiff demands judgment for $5 million in compensatory damages, and $2 million in survival damages for pre-death suffering.

**Count II – 42 U.S.C. § 1983**
**(Failure to Protect from Known Suicide Risk—against all Defendants)**

129.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

130.    A § 1983 claim for failure to prevent suicide requires: (1) a particular vulnerability to suicide, (2) knowledge of that vulnerability by officials, (3) deliberate indifference to the risk, and (4) causation.

131.    Mr. Ferrufino had a particular vulnerability to suicide, shown by his psychiatric history, prior suicide attempts, and sponsor's warning that he feared another detox would be unbearable.

132.    Loudoun County maintained official policies and customs regarding suicide prevention, intake screening, and withdrawal management. These policies required prompt identification of high-risk detainees, mental health intervention, and medical monitoring.

133.    At the time of his detention, Mr. Ferrufino presented an obvious and documented risk of suicide, including acute untreated withdrawal, severe insomnia, documented history of psychiatric illness and prior suicidal ideation, and on September 3, 2024, submitted a written plea for help describing acute suffering.

134.    ADC intake medical sheets also recorded his warning that he needed medications to prevent seizures, and provider orders confirmed acknowledgment of his substance and alcohol abuse history and withdrawal risk.

135.     ADC staff had actual knowledge of these risk factors. They were aware of his disclosure of psychiatric medications at intake, provider orders, his COWS and CIWA scores reflecting persistent withdrawal, and his written request on September 3, 2024, in which he pleaded that he was in pain, had not slept in five days, and two medical encounters on September 4, 2024, including a request for follow-up with outside providers and a physician mental-health appointment. *See* **Exhibit 5 and 8.**

136.     Even with this information, Defendants failed to place him on suicide watch, protective custody, or constant observation, and did not obtain mental-health clearance as required by LCSO GO 503.4 and Virginia's 6VAC15-40-1010.

137.     Instead, Defendants housed him in general population with full bedding, including a bedsheet that he used to hang himself. This violated LCSO GO 503.4's mandate to remove ligatures and provide protective custody.

138.     LCSO GO 503.4 required that detainees demonstrating these risk factors be placed on protective custody, subjected to constant or at least fifteen-minute checks, monitored medically twice per hour, and evaluated by mental health staff before release from watch, for detainees with a recent history of suicidal ideation or attempts.

139.     Likewise, Virginia's minimum standards, 6VAC15-40-1010, require that every facility maintains a suicide prevention and intervention plan covering screening and referral.

140.     Despite the clear risk indicators and the mandates of their own policies, ADC housed Mr. Ferrufino in general population with access to bedding and ligature points. The record contains no documentation of suicide watch, enhanced observation, or psychiatric clearance.

141.     The provision or failure to remove bedsheets from detainees known to be suicidal is recognized by correctional standards and the federal courts as deliberate indifference per se.

Both the ACA and NCCHC direct that ligature hazards, including bedding, be removed from suicidal detainees. Federal courts have likewise imposed liability under similar circumstances. *See Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 480 (6th Cir. 2020); *Beckwith v. Blair Cnty.*, Civ. No. 3:18-40, 2022 WL 225456 (W.D. Pa. Jan. 28, 2022).

142.    By leaving Mr. Ferrufino in general population with a bedsheet and ligature points, ADC staff affirmatively created and disregarded an obvious risk of suicide. Their conduct was objectively unreasonable and deliberately indifferent under the Fourteenth Amendment, and it directly resulted in Mr. Ferrufino's death.

143.    These breaches of suicide-prevention policies constitute deliberate indifference and directly and proximately caused his death on September 6, 2024.

WHEREFORE Plaintiff demands judgment for $5 million in compensatory damages.

## Count III – 42 U.S.C. § 1983
### (Municipal  Liability Under *Monell*—against all Defendants)

144.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

145.    Under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), municipal liability attaches where (1) a policy, custom, or practice exists, (2) it reflects deliberate indifference to constitutional rights, and (3) it is the moving force behind the injury.

146.    Defendants are liable under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), because the constitutional violations in this case were caused by policies, practices, or customs that were so persistent and widespread as to constitute the County's standard operating procedure.

147.    Defendants maintained written policies requiring suicide prevention, LCSO GO 503.4, reporting of inmate deaths, LCSO GO 503.5, incident reporting, LCSO GO 502.9, housing and cell-entry standards, LCSO GO 502.3, and adoption of statewide minimum standards through

LCSO GO 501.2. Virginia's standards likewise require continuity of care, 6VAC15-40-420, and suicide-prevention programs, 6VAC15-40-1010.

148.    In practice, however, Defendants tolerated and perpetuated a widespread custom of disregarding those policies. Intake screenings were routinely ignored, detox protocols not escalated, and suicide-prevention housing rarely enforced.

149.    These included cancelling psychiatric and MAT prescriptions without verification, substituting only symptomatic agents, ignoring withdrawal and insomnia indicators, disregarding urgent intake disclosures that he required medications to prevent seizures, failing to act on provider orders acknowledging withdrawal risk, failing to escalate medical pleas, and treating a September 4 mental health appointment as routine with no follow-up or protective action. The Defendants also permitted housing suicidal detainees in general population with bedding and ligature points.

150.    In Mr. Ferrufino's case, that custom manifested in cancelling all long-term psychiatric and MAT prescriptions as "cancelled by provider" without verification, substituting only minimal symptomatic medications, ignoring repeated withdrawal scores and severe insomnia, failing to escalate his written plea for help, housing him in general population rather than protective custody, and failing to follow up on medical records until after his death.

151.    These failures demonstrate systemic disregard for policies, not isolated oversight. County policymakers and supervisors knew or should have known that staff were disregarding intake assessments, urgent requests, and suicide-prevention mandates, and failed to train or supervise adequately.

152.    A particularly egregious manifestation of this unconstitutional custom was Defendants practice of leaving suicidal detainees in cells with *full bedding*, including bedsheets, despite clear knowledge that bedding is a common ligature and a leading means of custodial

24

suicide. LCSO GO 503.4 requires placement in protective housing, and national standards issued by the American Correctional Association (ACA) and the National Commission on Correctional Health Care (NCCHC) mandate ligature-resistant housing and removal of bedding when suicide risk is identified. Yet Mr. Ferrufino was left in general population with a bedsheet, which he used to hang himself, resulting in his suicide.

153.    Federal courts have repeatedly recognized that leaving bedsheets with a suicidal detainee constitutes deliberate indifference. *See Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 480 (6th Cir. 2020) (finding deliberate indifference where suicidal detainee was placed in a barred cell with a bedsheet); *Beckwith v. Blair Cnty.*, Civ. No. 3:18-40, 2022 WL 225456 (W.D. Pa. Jan. 28, 2022) (denying summary judgment where suicidal detainee hanged herself using bedsheet strips). Defendants' tolerance of the same practice demonstrates a systemic failure to enforce its written suicide-prevention policies.

154.    These customs and failures reflect deliberate indifference on the part of Loudoun County policymakers. ADC supervisors knew or should have known that medications were routinely cancelled without verification, that protective custody was not consistently used for suicidal detainees, and that bedsheets were left in cells despite national and local standards identifying them as ligatures. The Defendants' failure to train and supervise staff to enforce these policies amounts to deliberate indifference to detainees' constitutional rights.

155.    The unconstitutional policies, customs, and practices described above were the moving force behind Mr. Ferrufino's death. Had Defendants enforced their written policies or complied with well-established correctional standards, Mr. Ferrufino would have been provided with medications, housed in suicide-resistant housing without bedsheets, and monitored

appropriately. His death was preventable, and it was caused by the County's deliberate indifference.

WHEREFORE, Plaintiff demands $5 million in compensatory damages and attorney's fees under 42 U.S.C. § 1988.

### Count IV – Wrongful Death (Va. Code § 8.01-50 et seq.)
**(Against all Defendants)**

156.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

157.    Virginia Code § 8.01-50 creates a cause of action for wrongful death where a person's death is caused by the wrongful act, neglect, or default of another, and the decedent could have recovered damages had death not ensued.

158.    Under Virginia Code § 8.01-52, statutory beneficiaries are entitled to damages for sorrow, mental anguish, loss of companionship, financial support, services, and funeral expenses.

159.    Defendants owed Mr. Ferrufino a duty to exercise reasonable care for his health and safety to protect him from foreseeable harm while he was in custody at the Loudoun County ADC.

160.    That duty was heightened by specific statutory and policy mandates, including Virginia Minimum Standards requiring receiving screening and continuity of care, 6VAC15-40-420, the suicide prevention requirement at 6VAC15-40-1010, and the ADC General Orders requiring protective custody and medical verification.

161.    Defendants breached these duties by cancelling his essential long-term psychiatric and MAT prescriptions without verification, substituting only symptomatic agents such as ibuprofen, hydroxyzine, and clonidine, ignoring persistent withdrawal symptoms and severe insomnia, triaging his September 3rd and 4th written pleas for help as "routine" rather than urgent, and allowing the outside medical records request to languish until four days after his death.

26

162.    Defendants failed to place him on suicide watch despite documented psychiatric history and housed him in a cell with ligature points rather than a suicide-resistant cell.

163.    Defendants further breached their duties by housing Mr. Ferrufino in general population despite clear suicide risk indicators, and by leaving him with bedding and a bedsheet that provided an obvious ligature point. Both LCSO GO 503.4 and nationally recognized standards issued by the ACA and the NCCHC prohibit allowing suicidal detainees access to bedding materials capable of being used as ligatures.

164.    The danger of leaving bedsheets with suicidal detainees is so widely recognized that federal courts treat it as deliberate indifference per se. *See Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 480 (6th Cir. 2020); *Beckwith v. Blair Cnty.*, Civ. No. 3:18-40, 2022 WL 225456 (W.D. Pa. Jan. 28, 2022).

165.    By ignoring these standards and allowing Mr. Ferrufino to remain in a cell with a bedsheet, Defendants affirmatively created the conditions of his death.

166.    These wrongful acts and neglect were the direct and proximate cause of Mr. Ferrufino's death by hanging on September 6, 2024. But for Defendant's breaches of its own required policies, Mr. Ferrufino's death would not have occurred.

167.    Because of this wrongful death, his statutory beneficiaries, his immediate family members, have suffered damages including loss of income and services, loss of companionship and comfort, and sorrow and mental anguish.

168.    As a direct and proximate result of these breaches, Mr. Ferrufino suffered conscious pain and suffering, culminating in his death. His statutory beneficiaries are entitled to damages as stated in Va. Code § 8.01-52.

WHEREFORE Plaintiff seeks judgment against Defendant in the amount of $5 million in compensatory damages under Va. Code § 8.01-52 for the wrongful death, including funeral and burial expenses.

## Count V – Gross Negligence
### (Against all Defendants)

169.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

170.     Virginia law distinguishes ordinary negligence from gross negligence. Ordinary negligence involves a failure to exercise reasonable care, whereas gross negligence "shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of another." *See Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996). A finding of gross negligence requires proof of conduct so egregious as to shock fair-minded persons. *See Griffett v. Ryan*, 247 Va. 465 (1994).

171.     Under Virginia law, gross negligence removes the shield of sovereign immunity. *Chapman v. City of Virginia Beach*, 252 Va. 186, 190–91 (1996). The County's conduct here meets that definition.

172.     Defendant owed a duty to exercise reasonable care for the safety of detainees, including Mr. Ferrufino, who was wholly dependent on the County for his health and protection.

173.     Defendants' conduct rose above mere negligence and demonstrated an utter disregard of prudence amounting to complete neglect of Mr. Ferrufino's safety.

174.     Intake staff failed to verify or continue Mr. Ferrufino's prescribed medications despite his documented history of psychiatric illness and repeated requests for verification. ADC staff ignored multiple withdrawal assessments reflecting deteriorating symptoms, and no escalation occurred despite visible suffering.

175.     Defendants cancelled essential prescriptions without verification, failed to act on obvious withdrawal and suicide indicators, ignored intake sheets where Mr. Ferrufino warned of seizure risk without his medications, disregarded provider orders acknowledging his withdrawal risk, and left him in general population with a bedsheet despite clear suicide risk.

176.     Despite clear knowledge of his psychiatric risk, officials failed to implement suicide watch, failed to place him in suicide-resistant housing, and left him in a cell with ligature points.

177.     His written request for help, stating he was in "a lot of pain physically and emotionally" and had not slept in five days, was ignored entirely. *See* **Exhibit 8.**

178.     This conduct reflected an utter disregard of prudence amounting to complete neglect of his safety, especially given the known risks of suicide during withdrawal and early detention.

179.     This abandonment of both medical and custodial safeguards went far beyond ordinary negligence.

180.     It was not a mere error in judgment but amounted to a wholesale refusal to provide the minimum protections required by policy and law. Defendants conduct reflected an utter disregard for the safety of Mr. Ferrufino and the complete neglect of duties it knew were necessary to prevent suicides in custody.

181.     The Defendants' actions and omissions, including ignoring clear suicide warning signs, disregarding mandatory observation requirements, and failing to respond to escalating medical distress, constitute an utter disregard of prudence amounting to complete neglect for Mr. Ferrufino's safety.

182.    In the context of well-known risks of suicide during the first days of incarceration and during acute withdrawal, Defendants' inaction demonstrates gross negligence under Virginia law.

183.    This gross negligence was the direct and proximate cause of Mr. Ferrufino's death by suicide.

WHEREFORE Plaintiff seeks judgment in the amount of $3 million in compensatory damages for the losses suffered by his beneficiaries.

### Count VI – Survivorship Action (Va. Code § 8.01-25)
### (Against all Defendants)

184.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

185.    In establishing a claim for survivorship pursuant to Virginia code §8.01-25: (1) the decedent experienced conscious pain and suffering; (2) caused by the Defendant's wrongful conduct; and (3) the estate may recover damages for the period between injury and death.

186.    Before his death, Mr. Ferrufino endured severe physical and emotional pain due to the County's constitutional and statutory violations.

187.    Prior to his death, Mr. Ferrufino experienced endured days of conscious pain and suffering documented by CIWA/COWS monitoring, intake sheets, provider orders, and medical encounters. These records showed tremors, gastrointestinal distress, chills, agitation, and severe insomnia.

188.    Further, Mr. Ferrufino was seen banging on his cell and refusing assessments due to distress. On September 3, 2024, he wrote a plea to staff stating, "I am in a lot of pain physically and emotionally," and "I have not slept in five days."

189.    These conditions were exacerbated by Defendants' cancellation of his prescribed regimen, failure to provide continuity of care as required by 6VAC15-40-420, disregard of intake

provider orders acknowledging withdrawal risk, and decision to leave him in general population with bedding despite known suicide risk.

190.    6VAC15-40-420 required verification and continuation of prescriptions, yet his psychiatric medications and Suboxone were discontinued without substitution or taper.

191.    Mr. Ferrufino consciously suffered these conditions until his death on September 6, 2024. EMS records documenting extended resuscitation attempts confirm he remained alive for a significant period after discovery, adding to the conscious pain endured immediately before death.

192.    As a result of these breaches, Mr. Ferrufino endured extreme physical pain, fear, and psychological anguish before his suicide.

193.    Plaintiff, as administrator of the Estate, is entitled to recover damages for this conscious pain and suffering pursuant to Va. Code § 8.01-25.

WHEREFORE Plaintiff, as administrator of the estate, seeks judgment for $2 million in survival damages for the conscious pain and suffering Mr. Ferrufino endured, together with all available costs and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter judgment against Defendants Loudoun County, Virginia, and award the following relief:

     i.     Compensatory damages for violations of 42 U.S.C. §1983 in the amount of $5 million;

     ii.     Compensatory damages for wrongful death in the amount of $5 million;

     iii.     Compensatory damages for gross negligence in the amount of $3 million;

     iv.     Survival damages for conscious pain and suffering in the amount of $2 million;

     v.     Punitive damages to be awarded at trial;

     vi.     Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

     vii.     Any such other relief as this Court deems just and proper.

Respectfully Submitted,
ESTATE   OF   LUIS   MICHAEL
SANTAMARIA FERRUFINO
By Counsel

Paul Mickelsen, VSB# 71274
Reem Rana, VSB# 99935
TATE BYWATER
2740 Chain Bridge Rd.
Vienna, VA 22181
P: (703) 938-5100
F: (703) 991-0605
pmickelsen@tatebywater.com
rrana@tatebywater.com
*Counsel for Plaintiff*